United States Courts
Southern District of Texas
F I L E D

MAY 2 8 2026

Nathan Ochsner, Clerk of Court

**NOTICE OF FILING**

**IN THE OFFICE OF THE SHERIFF FOR HARRIS COUNTY**

**STATE OF TEXAS**

**Date: April 9, 2026**

To:     Harris County Sheriff's Office
        ATTN: Sheriff Ed Gonzalez or Acting Sheriff Incumbent and his successors and assigns
        1200 Baker Street
        Houston, TX 77002

**RE: Notice of Federal Interest, Pending Title Dispute, and Demand to Refrain from Sheriff's Sale Scheduled May 5, 2026**

I. NOTICE AND PURPOSE

This Notice is provided to inform you, in your official capacity as Sheriff of Harris County, of the existence of:

1. A pending dispute involving title to real property located at:

   **15538 Kiplands Bend Drive, Houston, Harris County, Texas 77014-1535** (the "Subject Property");

2. Asserted and potential **federal interests** in said property;

3. Active legal proceedings seeking injunctive and declaratory relief; and

4. The **legal consequences** that may arise from proceeding with any sheriff's sale under these circumstances.

You are hereby placed on **actual notice** that any action taken to conduct, enforce, or participate in a sheriff's sale affecting the Subject Property, while such federal interests and disputes remain unresolved, may implicate serious constitutional, statutory, and criminal concerns.

II. FEDERAL SUPREMACY AND LIMITATIONS ON STATE AUTHORITY

A. Supremacy Clause

Under the **Supremacy Clause (U.S. Const. art. VI, cl. 2)**, federal law is the supreme law of the land and preempts conflicting state action. A state official, including a sheriff, **may not**

Notice #62025040-2354

**take action that interferes with federal property interests** absent clear authorization from Congress.

A sheriff's sale purporting to extinguish or impair a federal interest without such authorization is subject to preemption and may be invalid.

B. McCulloch v. Maryland

Under *McCulloch v. Maryland*, 17 U.S. 316 (1819):

> States and their officers may not regulate, burden, or interfere with the lawful operations or property interests of the United States.

Any forced sale affecting property in which the United States has an interest may violate this foundational doctrine.

C. Due Process (Fifth Amendment)

The **Due Process Clause of the Fifth Amendment** protects the United States from deprivation of property without due process of law.

A sheriff's sale conducted:

- Without proper notice to the United States; or

- Outside authorized statutory procedures

may constitute a violation of federal due process protections.

III. FEDERAL STATUTORY FRAMEWORK GOVERNING REAL PROPERTY INTERESTS

A. Quiet Title Act — 28 U.S.C. § 2409a

This statute provides the **exclusive mechanism** for adjudicating disputes involving title to real property in which the United States claims an interest.

- Such disputes must be resolved in **federal court**;

- A state sheriff's sale cannot lawfully adjudicate or extinguish such interests outside this framework.

Notice #62025040-2354

## B. Exclusive Federal Jurisdiction — 28 U.S.C. § 1346(f)

Federal district courts have **exclusive jurisdiction** over civil actions involving title disputes with the United States.

Any state-level process attempting to determine or impair such title interests may intrude upon exclusive federal jurisdiction.

## C. Actions Affecting Federal Liens — 28 U.S.C. § 2410

Where the United States holds a lien:

- It must be **properly named as a party**;

- It must be **properly served**;

- Proceedings must strictly comply with federal statutory requirements.

Failure to comply renders any sale potentially **invalid as to the federal interest**.

## IV. ADDITIONAL FEDERAL REGULATORY INTERESTS

Depending on the nature of the loan or property, additional federal frameworks may apply:

- **Securities Act of 1933 / Securities Exchange Act of 1934**
  If the loan is securitized or subject to SEC oversight, a sheriff's sale may conflict with federal regulatory authority or court orders.

- **Housing Act of 1949 and FHA/HUD Programs**
  Federal housing programs may impose conditions on foreclosure, conveyance, and title transfer that cannot be overridden by state processes.

- **VA Loan Guaranty Program (38 U.S.C. §§ 3720 et seq.)**
  Federal interests arising from guarantees or indemnity obligations may be impaired by unauthorized state action.

## V. CIVIL RIGHTS AND CRIMINAL STATUTES

You are further notified that willful action taken under color of law that deprives a person of rights or interferes with federal interests may give rise to liability under federal statutes, including but not limited to:

### A. Civil Rights Statutes

- **42 U.S.C. §§ 1982–1988**
  Protect rights related to property ownership, use, and disposition, and provide remedies for violations under color of law.

### B. Federal Criminal Statutes

- **18 U.S.C. § 241** — Conspiracy Against Rights

- **18 U.S.C. § 242** — Deprivation of Rights Under Color of Law

- **18 U.S.C. § 245** — Federally Protected Activities

These statutes address willful conduct that deprives individuals of constitutional or federally protected rights.

Enforcement authority for such criminal provisions lies with the **United States Department of Justice**.

## VI. NOTICE OF POTENTIAL LIABILITY

This Notice is provided to ensure that all actions taken are fully informed and consistent with:

- Constitutional limitations;

- Federal statutory requirements;

- Applicable due process protections.

Proceeding with a sheriff's sale affecting property in which federal interests are asserted, without proper adjudication and compliance with federal law, may expose involved parties to:

Notice #62025040-2354

- Judicial invalidation of the sale;

- Civil liability;

- Other legal consequences as determined by appropriate authorities.

## VII. DEMAND

Accordingly, you are hereby requested to:

1. **Refrain from conducting or participating in any sheriff's sale** affecting the Subject Property pending resolution of the underlying title dispute;

2. Ensure that any actions taken are in full compliance with applicable **federal and constitutional requirements**;

3. Preserve the status quo until proper judicial determination of all interests is obtained.

## VIII. RESERVATION

All rights, claims, and remedies are expressly reserved.

Respectfully submitted,

Chanee Tennille Coleman

Petitioner and Real Party in Interest

**Date**: April 9, 2026.

By: _____

Chanee Coleman, without prejudice
15538 Kiplands Bend Drive
Houston, Texas  [77014-1535]
All rights reserved

Notice #62025040-2354

# EXHIBIT 1

## BLOCK, SECRETARY OF AGRICULTURE, ET AL. *v.* NORTH DAKOTA EX REL. BOARD OF UNIVERSITY AND SCHOOL LANDS

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 81–2337.  Argued February 23, 1983—Decided May 2, 1983*

North Dakota filed suit in Federal District Court against several federal officials to resolve a dispute as to ownership of certain portions of a riverbed within the State.  The United States claims title to most of the disputed area on the basis of its status as a riparian landowner on a non-navigable river, while the State asserts that the river was navigable when North Dakota was admitted to the Union in 1889 and thus it owns the riverbed under the equal-footing doctrine.  In addition to seeking injunctive, declaratory, and mandamus relief under various federal statutes, North Dakota asserted a claim under the Quiet Title Act of 1972 (QTA), by which the United States, subject to certain exceptions, has waived its sovereign immunity and has permitted plaintiffs to name it as a party defendant in civil actions to adjudicate title disputes involving real property.  After trial, the court entered judgment for the State, holding that the QTA's 12-year statute of limitations, 28 U. S. C. § 2409a(f), does not apply where the plaintiff is a State.  The Court of Appeals affirmed.

*Held:*

1. The legislative history establishes that Congress intended the QTA to provide the exclusive means by which adverse claimants can challenge the United States' title to real property.  Thus there is no merit to North Dakota's contention that even if suit under the QTA is time-barred under § 2409a(f), the judgment below is still correct because the suit is maintainable as an "officer's suit" for injunctive or mandamus relief against the federal officials charged with supervision of the disputed area.  The rule that a precisely drawn, detailed statute pre-empts more general remedies is applicable here.  Cf. *Brown* v. *GSA*, 425 U. S. 820. Pp. 280–286.

2. The limitations provision in § 2409a(f) is as fully applicable to a State as it is to all others who sue under the QTA.  When Congress at-

---

*Together with No. 82–132, *North Dakota ex rel. Board of University and School Lands* v. *Block, Secretary of Agriculture, et al.*, also on certiorari to the same court.


AUTHENTICATED
U.S. GOVERNMENT

taches conditions, such as a statute of limitations, to legislation waiving the United States' sovereign immunity, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied. Section 2409a(f) expressly states that *any* civil action is time-barred unless filed within 12 years after the date it accrued. Even assuming that the canon of statutory construction that a sovereign is normally exempt from the operation of a generally worded statute of limitations in the absence of express contrary intent has relevance in construing the applicability to the States of a congressionally imposed statute of limitations not expressly including the States, here the legislative history shows that Congress did not intend to exempt the States from compliance with § 2409a(f). Pp. 286–290.

3. Nor is § 2409a(f) invalid under the equal-footing doctrine and the Tenth Amendment, as North Dakota asserts. A federal law depriving a State of land vested in it by the Constitution would not be invalid on such grounds, but would constitute a taking of the State's property without just compensation, in violation of the Fifth Amendment. Section 2409a(f), however, does not purport to strip anyone of any property or to effectuate a transfer of title. A dismissal pursuant to the statute does not quiet title to the disputed land in the United States; the title dispute remains unresolved. Thus there is no constitutional infirmity in § 2409a(f). Pp. 291–292.

4. If North Dakota's suit is barred by § 2409a(f), the courts below had no jurisdiction to inquire into the merits. Since the lower courts made no findings as to the date on which North Dakota's suit accrued for purposes of the statute, the cases must be remanded for further proceedings. Pp. 292–293.

671 F. 2d 271, reversed and remanded.

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, *post*, p. 293.

*Deputy Solicitor General Claiborne* argued the cause for petitioners in No. 81–2337. With him on the brief were *Solicitor General Lee, Assistant Attorney General Dinkins, Jacques B. Gelin,* and *Edward J. Shawaker.*

*Robert O. Wefald,* Attorney General of North Dakota, argued the cause for respondents in No. 81–2337. With him on the brief was *Owen L. Anderson.*†

---

†Briefs of *amici curiae* urging affirmance were filed for the State of Colorado by *J. D. MacFarlane,* Attorney General, *Charles G. Howe,* Dep-

JUSTICE WHITE delivered the opinion of the Court.

Under the Quiet Title Act of 1972 (QTA),[1] the United States, subject to certain exceptions, has waived its sover-

---

uty Attorney General, *Joel W. Cantrick*, Solicitor General, *Janet L. Miller*, First Assistant Attorney General, and *Kathleen M. Bowers*, Assistant Attorney General; and for the State of California et al. by *George Deukmejian*, Attorney General of California, *N. Gregory Taylor*, Assistant Attorney General, *Dennis M. Eagan, Bruce S. Flushman*, and *Joseph Barbieri*, Deputy Attorneys General; *Charles A. Graddick*, Attorney General of Alabama; *Norman C. Gorsuch*, Attorney General of Alaska, and *Michael W. Sewright*, Assistant Attorney General; *Robert K. Corbin*, Attorney General of Arizona, and *Anthony Ching*, Solicitor General; *John Steven Clark*, Attorney General of Arkansas; *Richard S. Gebelein*, Attorney General of Delaware, and *J. Calvin Williams*, Deputy Attorney General; *Jim Smith*, Attorney General of Florida; *Michael J. Bowers*, Attorney General of Georgia; *Tany S. Hong*, Attorney General of Hawaii; *David H. Leroy*, Attorney General of Idaho; *Tyrone C. Fahner*, Attorney General of Illinois; *Thomas J. Miller*, Attorney General of Iowa; *William J. Guste, Jr.*, Attorney General of Louisiana, and *Gary L. Keyser*, Assistant Attorney General; *Frank J. Kelley*, Attorney General of Michigan, and *Louis J. Caruso*, Solicitor General; *Warren Spannaus*, Attorney General of Minnesota; *Michael T. Greely*, Attorney General of Montana; *Richard H. Bryan*, Attorney General of Nevada; *Irwin I. Kimmelman*, Attorney General of New Jersey; *Robert Abrams*, Attorney General of New York; *Jan Eric Cartwright*, Attorney General of Oklahoma; *Dave Frohnmayer*, Attorney General of Oregon; *LeRoy S. Zimmerman*, Attorney General of Pennsylvania; *Dennis J. Roberts II*, Attorney General of Rhode Island; *Daniel R. McLeod*, Attorney General of South Carolina; *Mark V. Meierhenry*, Attorney General of South Dakota, and *Roxanne Giedd*, Assistant Attorney General; *John J. Easton, Jr.*, Attorney General of Vermont, and *John H. Chase*, Assistant Attorney General; *Kenneth O. Eikenberry*, Attorney General of Washington; and *A. G. McClintock*, Attorney General of Wyoming.

[1] Act of Oct. 25, 1972, Pub. L. 92–562, 86 Stat. 1176, codified at 28 U. S. C. § 2409a, 28 U. S. C. § 1346(f), and 28 U. S. C. § 1402(d).

The provision relevant to the present case, 28 U. S. C. § 2409a, states:

"(a) The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights. This section does not apply to trust or restricted Indian lands, nor does it apply to or affect actions which may be or could have

eign immunity and has permitted plaintiffs to name it as a party defendant in civil actions to adjudicate title disputes involving real property in which the United States claims an interest. These cases present two separate issues concerning the QTA. The first is whether Congress intended the QTA to provide the exclusive procedure by which a claimant can judicially challenge the title of the United States to real

---

been brought under sections 1346, 1347, 1491, or 2410 of this title, sections 7424, 7425, or 7426 of the Internal Revenue Code of 1954, as amended (26 U. S. C. 7424, 7425, and 7426), or section 208 of the Act of July 10, 1952 (43 U. S. C. 666).

"(b) The United States shall not be disturbed in possession or control of any real property involved in any action under this section pending a final judgment or decree, the conclusion of any appeal therefrom, and sixty days; and if the final determination shall be adverse to the United States, the United States nevertheless may retain such possession or control of the real property or of any part thereof as it may elect, upon payment to the person determined to be entitled thereto of an amount which upon such election the district court in the same action shall determine to be just compensation for such possession or control.

"(c) The complaint shall set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States.

"(d) If the United States disclaims all interest in the real property or interest therein adverse to the plaintiff at any time prior to the actual commencement of the trial, which disclaimer is confirmed by order of the court, the jurisdiction of the district court shall cease unless it has jurisdiction of the civil action or suit on ground other than and independent of the authority conferred by section 1346(f) of this title.

"(e) A civil action against the United States under this section shall be tried by the court without a jury.

"(f) Any civil action under this section shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

"(g) Nothing in this section shall be construed to permit suits against the United States based upon adverse possession."

property.   The second is whether the QTA's 12-year statute of limitations, 28 U. S. C. § 2409a(f), is applicable in instances where the plaintiff is a State, such as respondent North Dakota.   We conclude that the QTA forecloses the other bases for relief urged by the State, and that the limitations provision is as fully applicable to North Dakota as it is to all others who sue under the QTA.

I

It is undisputed that under the equal-footing doctrine first set forth in *Pollard's Lessee* v. *Hagan*, 3 How. 212 (1845), North Dakota, like other States, became the owner of the beds of navigable streams in the State upon its admission to the Union.   It is also agreed that under the law of North Dakota, a riparian owner has title to the center of the bed of a nonnavigable stream.   See N. D. Cent. Code § 47–01–15 (1978); *Amoco Oil Co.* v. *State Highway Dept.*, 262 N. W. 2d 726, 728 (N. D. 1978).   Because of differing views of navigability, the United States and North Dakota assert competing claims to title to certain portions of the bed of the Little Missouri River within North Dakota.   The United States contends that the river is not now and never has been navigable, and it claims most of the disputed area based on its status as riparian landowner.[2]   North Dakota, on the other hand, asserts that the river was navigable on October 1, 1889, the date North Dakota attained statehood, and therefore that title to the disputed bed vested in it under the equal-footing doctrine on that date.   Since at least 1955, the United States has been issuing riverbed oil and gas leases to private entities.

Seeking to resolve this dispute as to ownership of the riverbed, North Dakota filed this suit in the District Court

___

[2] In some parts of the disputed area, the United States' claim to the bed is founded on reasons other than its status as riparian landowner.   See Tr. 38–48.

against several federal officials.[3] The State's complaint requested injunctive and mandamus relief directing the defendants to "cease and desist from develop[ing] or otherwise exercising privileges of ownership upon the bed of the Little Missouri River within the State of North Dakota," and it further sought a declaratory judgment "[d]eclaring the Little Missouri River to be a navigable river for the purpose of determining ownership of the bed." App. 9. As the jurisdictional basis for its suit, North Dakota invoked 28 U. S. C. § 1331 (federal question); 28 U. S. C. § 1361 (mandamus); 28 U. S. C. §§ 2201–2202 (declaratory judgment and further relief); and 5 U. S. C. §§ 701–706 (the judicial review provisions of the Administrative Procedure Act). App. 6. North Dakota's original complaint did not mention the QTA. However, the District Court required the State to amend its complaint to recite a claim thereunder. App. to Pet. for Cert. in No. 81–2337, pp. A–14—A–16. The State complied and filed an amended complaint. App. 13–16.[4]

The matter thereafter proceeded to trial. North Dakota introduced evidence in support of its claim that the river was navigable on the date of statehood.[5] The federal defendants, while denying navigability, presented no evidence on

---

[3] The complaint named as defendants the Secretary of the Interior, the Secretary of Agriculture, the Director of the United States Bureau of Land Management, and the Chief of the United States Forest Service. App. 6. The defendants were alleged to have "final authority" over the agencies that were "presently unlawfully asserting ownership over sovereign lands of the State of North Dakota." *Id.*, at 7.

[4] North Dakota's amended complaint did not name the United States as a party defendant, even though the United States appears to be the only proper federal defendant under 28 U. S. C. § 2409a(a). The Solicitor General has expressly waived any objection the United States or the defendants might have as to this point. Brief for Petitioners in No. 81–2337, p. 31, n. 20.

[5] North Dakota's case consisted of documentary evidence of canoe travel on the river prior to statehood, an effort to float logs down the river shortly after statehood, present-day recreational canoe traffic, and other small craft usage over the years.

this point;[6] their evidence was limited to showing, for statute of limitations purposes, that the State had notice of the United States' claim more than 12 years prior to the commencement of the suit.

After trial, the District Court rendered judgment for North Dakota. The court first concluded that the Little Missouri River was navigable in 1889 and that North Dakota attained title to the bed at statehood under the equal-footing doctrine and the Submerged Lands Act of 1953, 43 U. S. C. § 1311(a). 506 F. Supp. 619, 622–624 (ND 1981). Then, applying what it deemed to be an accepted rule of construction that statutes of limitations do not apply to sovereigns unless a contrary legislative intention is clearly evident from the express language of the statute or otherwise, the court rejected the defendants' claim that North Dakota's suit was barred by the QTA's 12-year statute of limitations, 28 U. S. C. § 2409a(f). 506 F. Supp., at 625–626.[7] The District Court accordingly entered judgment quieting North Dakota's title to the bed of the river. App. to Pet. for Cert. in No. 81–2337, pp. A–29—A–30.[8] The Court of Appeals affirmed in all respects. 671 F. 2d 271 (CA8 1982).

---

[6] The federal defendants took the position that the State's evidence of navigability was so weak that it actually supported the view that the river was nonnavigable.

[7] To further support this conclusion, the court stated, albeit without elaboration, that the legislative history of the QTA showed that Congress intended the statute of limitations "to apply exclusively to persons, be they private citizens or private or public corporations." 506 F. Supp., at 625. The court also commented that the federal defendants' position was contrary to the express will of Congress, as indicated by the Submerged Lands Act, 43 U. S. C. § 1311(a). 506 F. Supp., at 626.

The defendants also argued in the District Court that the United States had acquired title to the bed by adverse possession, and that, in any event, the suit was barred by laches. The District Court rejected both of these contentions, id., at 624–626, and the defendants did not pursue them further.

[8] The judgment excluded those portions of the bed in which the Three Affiliated Tribes of the Fort Berthold Reservation had an interest. The

The defendants' petition for certiorari, which we granted, 459 U. S. 820 (1982), challenged only the Court of Appeals' conclusion that the QTA's statute of limitations is inapplicable to States. North Dakota filed a conditional cross-petition, No. 82–132, asserting that even if its suit under the QTA is barred by § 2409a(f), the judgment below is still correct because the QTA remedy is not exclusive and its suit against the federal officers is still maintainable wholly aside from the QTA. This submission, which the Court of Appeals did not find it necessary to address, is also urged by the State, as respondent in No. 81–2337, as a ground for affirming the judgment in its favor. See *United States* v. *New York Telephone Co.*, 434 U. S. 159, 166, n. 8 (1977); *Dayton Board of Education* v. *Brinkman*, 433 U. S. 406, 419 (1977). We now grant the cross-petition, which heretofore has remained pending, and we first address the question presented by it.

## II

The States of the Union, like all other entities, are barred by federal sovereign immunity from suing the United States in the absence of an express waiver of this immunity by Congress. *California* v. *Arizona*, 440 U. S. 59, 61–62 (1979); *Minnesota* v. *United States*, 305 U. S. 382, 387 (1939); *Kansas* v. *United States*, 204 U. S. 331, 342 (1907). Only upon passage of the QTA did the United States waive its immunity with respect to suits involving title to land. Prior to 1972, States and all others asserting title to land claimed by the United States had only limited means of obtaining a resolution of the title dispute—they could attempt to induce the United States to file a quiet title action against them, or they could petition Congress or the Executive for discretionary relief. Also, since passage of the Tucker Act in 1887, those claimants willing to settle for monetary damages rather than

---

Tribes were not named as parties to the State's suit, and the court concluded that their rights should be left unaffected by the judgment. *Id.*, at 622.

title to the disputed land could sue in the Court of Claims and attempt to make out a constitutional claim for just compensation.   See 28 U. S. C. § 1491; *Malone* v. *Bowdoin*, 369 U. S. 643, 647, n. 8 (1962).

Enterprising claimants also pressed the so-called "officer's suit" as another possible means of obtaining relief in a title dispute with the Federal Government.   In the typical officer's suit involving a title dispute, the claimant would proceed against the federal officials charged with supervision of the disputed area, rather than against the United States. The suit would be in ejectment or, as here, for an injunction or a writ of mandamus forbidding the defendant officials to interfere with the claimant's property rights.

As a device for circumventing federal sovereign immunity in land title disputes, the officer's suit ultimately did not prove to be successful.   This Court appeared to accept the device in early cases.   See *United States* v. *Lee*, 106 U. S. 196 (1882); *Meigs* v. *M'Clung's Lessee*, 9 Cranch 11 (1815). Later cases, however, were inconsistent; some held that such suits were barred by sovereign immunity, while others did not, and "it is fair to say that to reconcile completely all the decisions of the Court in this field . . . would be a Procrustean task."   *Malone* v. *Bowdoin, supra,* at 646.   Compare, *e. g.,* the cases cited 369 U. S., at 646, n. 6, with those cited *id.,* at 646, n. 7.

In *Malone,* the Court cut through the tangle of the previous decisions and applied to land disputes the rule announced in *Larson* v. *Domestic & Foreign Corp.,* 337 U. S. 682 (1949):

> "[T]he action of a federal officer affecting property claimed by a plaintiff can be made the basis of a suit for specific relief against the officer as an individual only if the officer's action is 'not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void.'"   *Malone, supra,* at 647 (quoting *Larson, supra,* at 702).

The *Larson-Malone* test plainly made it more difficult for a plaintiff to employ a suit against federal officers as a vehicle for resolving a title dispute with the United States. Thus, in the decade after *Malone*, claimants having disputes with the United States over real property met with little success in most courts.[9]

Against this background, Congress considered and passed the QTA in 1972. At a hearing on the bill, the officer's-suit possibility was called to the attention of Congress.[10] The predominant view, however, was that citizens asserting title to or the right to possession of lands claimed by the United States were "without benefit of a recourse to the courts," because of the doctrine of sovereign immunity.[11]

Congress sought to rectify this state of affairs. The original version of S. 216, the bill that became the QTA, was short and simple. Its substantive provision provided for no qualifications whatsoever. It stated in its entirety: "The United States may be named a party in any civil action brought by any person to quiet title to lands claimed by the United States." 117 Cong. Rec. 46380 (1971). The Executive Branch opposed the original version of S. 216 and proposed,

---

[9] See, *e. g.*, *County of Bonner* v. *Anderson*, 439 F. 2d 764 (CA9 1971); *Simons* v. *Vinson*, 394 F. 2d 732 (CA5), cert. denied, 393 U. S. 968 (1968); *Gardner* v. *Harris*, 391 F. 2d 885 (CA5 1968); *Switzerland Co.* v. *Udall*, 337 F. 2d 56 (CA4 1964), cert. denied, 380 U. S. 914 (1965). One Court of Appeals, however, construed *Malone* narrowly. See *Armstrong* v. *Udall*, 435 F. 2d 38, 42 (CA9 1970); *Andros* v. *Rupp*, 433 F. 2d 70, 73–74 (CA9 1970) (holding *Malone* to be inapplicable where the plaintiff has record title to the disputed land).

[10] See Hearing on S. 216 et al. before the Subcommittee on Public Lands of the Senate Committee on Interior and Insular Affairs, 92d Cong., 1st Sess., 64 (1971) (statement of Prof. J. Steadman); *id.*, at 81 (letter from L. Gendron, Esq.).

[11] S. Rep. No. 92–575, p. 1 (1971). See also H. R. Rep. No. 92–1559, p. 6 (1972); *id.*, at 9 (letter from the Attorney General); Hearing, *supra* n. 10, at 8 (Sen. Church); *id.*, at 2, 19 (M. Melich, Solicitor, Dept. of the Interior); *id.*, at 45 (letter from Sen. Hansen); *id.*, at 55 (T. McKnight); *id.*, at 74 (letter from R. Reynolds); *id.*, at 77 (statement of T. Cavanaugh).

in its stead, a more elaborate bill, reprinted in S. Rep. No. 92–575, pp. 7–8 (1971), providing several "appropriate safeguards for the protection of the public interest." [12]

This Executive proposal, made by the Justice Department, limited the waiver of sovereign immunity in several important respects. First, it excluded Indian lands from the scope of the waiver. The Executive Branch felt that a waiver of immunity in this area would not be consistent with "specific commitments" it had made to the Indians through treaties and other agreements. [13] Second, in order to insure that the waiver would not "serve to disrupt costly ongoing Federal programs that involve the disputed lands," the proposal allowed the United States the option of paying money damages instead of surrendering the property if it lost a case on the merits. [14] Third, the Justice Department proposal provided that the legislation would have prospective effect only; that is, it would not apply to claims that accrued prior to the date of enactment. This was deemed necessary so that the workload of the Justice Department and the courts could develop at a rate which could be absorbed. [15] Fourth, to insure that stale claims would not be opened up to litigation, [16] the proposed bill included a 6-year statute of limitations. [17]

The Senate accepted the Justice Department's proposal, with the notable exception of the provision that would have

---

[12] Hearing, *supra* n. 10, at 21 (S. Kashiwa, Assistant Attorney General); see *id.*, at 32 (J. McGuire, Dept. of Agriculture).

[13] *Id.*, at 2, 19 (M. Melich, Solicitor, Dept. of the Interior).

[14] *Ibid.* See also *id.*, at 3, 32 (views of Dept. of Agriculture); S. Rep. No. 92–575, pp. 5–6 (1971) (letter from the Attorney General).

[15] *Id.*, at 7 (letter from the Attorney General).

[16] H. R. Rep. No. 92–1559, p. 7 (1972) (letter from the Deputy Attorney General).

[17] The Justice Department proposal contained other, relatively minor limitations on the waiver. For example, it expressly stated that no one could claim against the United States by adverse possession, and it provided for exclusive federal jurisdiction. All of these changes were ultimately included in the legislation.

given the bill prospective effect only. The Senate-passed version of the bill contained a "grandfather clause" that would have allowed old claims to be asserted for two years after the bill became law.[18]

Primarily because of the grandfather clause, the Executive Branch could still not accept the bill. The Department of Justice argued that this clause could cause "a flood of litigation on old claims, many of which had already been submitted to the Congress and rejected," thereby putting "an undue burden on the Department and the courts."[19] As a compromise, the Department proposed to give up its insistence on "prospective only" language and to accept an increase in the statute of limitations to 12 years, in exchange for elimination of the grandfather clause.[20] This proposal had the effect of making the bill retroactive for a 12-year period. The House included this compromise in the version of the bill passed by it, and the Senate acquiesced and the bill became law with the compromise language intact.

In light of this legislative history, we need not be detained long by North Dakota's contention that it can avoid the QTA's statute of limitations and other restrictions by the device of an officer's suit. If North Dakota's position were correct, all of the carefully crafted provisions of the QTA deemed necessary for the protection of the national public in-

---

[18] This provision stated that an action would be barred unless an action was begun "within six years after the claim for relief first accrues *or within two years after the effective date of this Act*, whichever is later." 117 Cong. Rec. 46380 (1971) (emphasis added).

[19] H. R. Rep. No. 92–1559, p. 7 (1972) (letter from the Deputy Attorney General).

[20] *Id.*, at 7–8. The Department of Justice also objected to a provision in the Senate-passed version that would have made the limitations period begin to run only on the date that the plaintiff obtained actual knowledge of the United States' claim. The Department contended that the limitations period should begin to run on the date the claimant knew or should have known of the United States' claim, see *ibid.*, and Congress agreed to this change.

terest could be averted. "It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading." *Brown* v. *GSA,* 425 U. S. 820, 833 (1976).

If we were to allow claimants to try the Federal Government's title to land under an officer's-suit theory, the Indian lands exception to the QTA would be rendered nugatory. The United States could also be dispossessed of the disputed property without being afforded the option of paying damages, thereby thwarting the congressional intent to avoid disruptions of costly federal activities. Finally, and most relevant to the present cases, the QTA's 12-year statute of limitations, the one point on which the Executive Branch was most insistent, could be avoided, and, contrary to the wish of Congress, an unlimited number of suits involving stale claims might be instituted.

*Brown* v. *GSA, supra,* is instructive here. In that case, we held that § 717 of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–16, was the exclusive remedy for federal employment discrimination. There, as here, it was "problematic" whether any judicial relief at all was available prior to passage of the Act; the prevailing congressional view was that there was none. 425 U. S., at 826–828. There, as here, the "balance, completeness, and structural integrity" of the statute belied the contention that it "was designed merely to supplement other putative judicial relief." *Id.,* at 832. Thus, we applied the rule that a precisely drawn, detailed statute pre-empts more general remedies. *Id.,* at 834.[21] That rule is equally applicable in the present context.

Accordingly, we need not reach the question whether, prior to 1972, *Larson* v. *Domestic & Foreign Corp.,* 337

---

[21] See also *Great American Federal Savings & Loan Assn.* v. *Novotny,* 442 U. S. 366, 375–377 (1979); *Preiser* v. *Rodriguez,* 411 U. S. 475, 488–490 (1973); *United States* v. *Demko,* 385 U. S. 149, 151–152 (1966); 1A C. Sands, Statutes and Statutory Construction § 23.16 (4th ed. 1972).

U. S. 682 (1949), and *Malone* v. *Bowdoin*, 369 U. S. 643 (1962), would have permitted an officer's suit to be maintained under the present circumstances.[22] We hold that Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property.[23]

---

[22] We also reject North Dakota's claim that, even if the QTA pre-empted alternative remedies in 1972, Congress created a new supplemental remedy four years later when it amended 5 U. S. C. § 702 with Pub. L. 94-574, 90 Stat. 2721. That statute waived federal sovereign immunity for suits against federal officers in which the plaintiff seeks relief other than money damages, but it specifically confers no "authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." The QTA is such an "other statute," because, if a suit is untimely under the QTA, the QTA expressly "forbids the relief" which would be sought under § 702. See H. R. Rep. No. 94-1656, p. 13 (1976) (§ 702 provides no authority to grant relief "when Congress has dealt in particularity with a claim and [has] intended a specified remedy to be the exclusive remedy").

[23] The legislative history is clear that Congress intended to foreclose totally any suit on claims that accrued more than 12 years prior to the effective date of the QTA. The Constitution, however, requires that statutes of limitations must "'allow a reasonable time after they take effect for the commencement of suits upon existing causes of action.'" *Texaco, Inc.* v. *Short*, 454 U. S. 516, 527, n. 21 (1982) (quoting *Wilson* v. *Iseminger*, 185 U. S. 55, 62-63 (1902)). Therefore, *if* an "officer's suit" was available prior to 1972, and *if* the laches or limitations period for such a suit was longer than 12 years (and we express no opinion on either of these points), § 2409a(f) arguably was unconstitutional to the extent it extinguished claims that could have been brought at the time of its passage. See *Herrick* v. *Boquillas Land & Cattle Co.*, 200 U. S. 96, 102 (1906); *Sohn* v. *Waterson*, 17 Wall. 596, 599 (1873). North Dakota has not raised this issue, and it could not do so successfully, because, although the QTA was passed in 1972, the State did not bring this suit until 1978. However long the "reasonable time" period must be, it clearly need not be six years. Hence, even if North Dakota had a constitutional right to bring its suit within a short time after enactment of the QTA, it could not do so six years later solely by virtue of the QTA's failure to provide for the requisite "reasonable time."

## III

We also cannot agree with North Dakota's submission, which was accepted by the District Court and the Court of Appeals, that the States are not subject to the operation of §2409a(f). This issue is purely one of statutory interpretation, and we find no support for North Dakota's position in either the plain statutory language or the legislative history. The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress. A necessary corollary of this rule is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied. See, *e. g.*, *Lehman* v. *Nakshian*, 453 U. S. 156, 160–161 (1981); *United States* v. *Kubrick*, 444 U. S. 111, 117–118 (1979); *Honda* v. *Clark*, 386 U. S. 484, 501 (1967); *Soriano* v. *United States*, 352 U. S. 270 (1957); *United States* v. *Sherwood*, 312 U. S. 584, 591 (1941). When waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity. Accordingly, although we should not construe such a time-bar provision unduly restrictively, we must be careful not to interpret it in a manner that would "extend the waiver beyond that which Congress intended." *United States* v. *Kubrick, supra*, at 117–118 (citing *Soriano* v. *United States, supra; Indian Towing Co.* v. *United States*, 350 U. S. 61 (1955)). Accordingly, before finding that Congress intended here to exempt the States from satisfying the time-bar condition on its waiver of immunity, we should insist on some clear indication of such an intention.

Proceeding in accordance with these well-established principles, we observe that §2409a(f) expressly states that *any* civil action is time-barred unless filed within 12 years after the date it accrued. The statutory language makes no exception for civil actions by States. Nor is there any evidence

in the legislative history suggesting that Congress intended to exempt the States from the condition attached to the immunity waiver.[24] These facts alone, in the light of our approach to sovereign immunity cases, would appear to compel the conclusion that States are not entitled to an exemption from the strictures of § 2409a(f).

The State, however, relies on the well-known canon of statutory construction that "[s]tatutes of limitation are not . . . held to embrace the State, unless she is expressly designated, or necessarily included by the nature of the mischiefs to be remedied." *Weber* v. *Board of Harbor Comm'rs*, 18 Wall. 57, 70 (1873). Accord, *Guaranty Trust Co.* v. *United States*, 304 U. S. 126, 132–133 (1938). Because § 2409a(f) does not expressly include the State, North Dakota urges, and the Court of Appeals held, that the State was not barred by the statute. While recognizing that immunity waivers by the United States are to be carefully construed, the Court of Appeals concluded that precedence should be given to the competing canon of statutory construction that statutes of limitations should not apply to the States absent express legislative inclusion. 671 F. 2d, at 275–276.

We do not agree. In fashioning sovereign-immunity waiver legislation, Congress is certainly free to exempt the States from a statute of limitations or any other condition of the waiver. But there is no merit to North Dakota's assertion that a condition on a congressional waiver of *federal* sovereign immunity should be regarded as inapplicable to

---

[24] Recognizing that no express legislative history supports its position, North Dakota relies on congressional silence. As did the Court of Appeals, 671 F. 2d 271, 274–275 (CA8 1982), North Dakota notes the references in the House Committee Report, H. R. Rep. No. 92–1559 (1972), to "persons," "citizens," and "individual citizens," and the absence of any references to "States." However, to the extent that such general language has any relevance at all, the Report also refers to "plaintiff[s]," "owners of adjacent property," "land owner[s]," and "claimants"—all terms that can easily encompass States. See also S. Rep. No. 92–575 (1971) (using similar terms).

States in the absence of express intent to the contrary. This Court has never sanctioned such a rule. Quite the contrary, in *United States* v. *Louisiana*, 127 U. S. 182 (1888), the Court held that a general statute of limitations, one that did not expressly mention States, barred a State's claim against the Federal Government. And in *Minnesota* v. *United States*, 305 U. S., at 388–389, where the United States had waived its immunity on the condition that any suit against it had to be brought in a federal court, we concluded without hesitation that the plaintiff State's suit should have been dismissed for lack of jurisdiction, because it had been filed in state court, even though the federal-court condition did not expressly apply to States. Thus, neither Congress nor the decisions of this Court have suggested that the States are presumed to be exempt from satisfying the conditions placed by Congress on its immunity waivers; and, in light of our Constitution, which makes the federal law ultimately supreme, these holdings should not have been surprising.[25]

---

[25] Contrary to JUSTICE O'CONNOR's contention, *post*, at 297, this Court has never "recognized sovereign prerogatives of other governmental units as bars to defenses asserted by the United States." In support of this novel proposition, JUSTICE O'CONNOR's dissent relies on *New Orleans* v. *United States*, 10 Pet. 662 (1836). In fact, to the extent that case is at all apposite, it supports the contrary view. The case involved a title dispute between the United States and the New Orleans municipal corporation. The National Government contended, *inter alia*, that certain official federal actions regarding the disputed property, "some of which were induced by the special application of the corporation, afford[ed] strong evidence, . . . not only of the right of the United States to the property in question, but that such right was fully recognized by the corporation." *Id.*, at 735. The Court found that these facts constituted an "admission" by the city that the Federal Government had title, and that the city's acts, if left unexplained, would have "strengthen[ed] the argument against the claim set up by the city." *Ibid.* The Court ultimately did not regard this evidence as prejudicing the city's claim, however, primarily because the city authorities were found to have acted in ignorance of their rights, due to their foreign language and habits, their civil law background, and their lack of familiarity with our Government and the principles of our jurisprudence. *Id.*, at 735–736. The Court also assumed that the city authorities did not have

We do not discount the importance of the generally applicable rule of statutory construction relied upon by the Court of Appeals. The judicially created rule that a sovereign is normally exempt from the operation of a generally worded statute of limitations has retained its vigor because it serves the public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers. *Guaranty Trust Co.* v. *United States, supra,* at 132. Thus, in these cases, the rule would further the interests of the citizens of North Dakota, by affording them some protection against the negligence of state officials in failing to comply with the otherwise applicable statute of limitations.

Even assuming, however, that this rule has relevance in construing the applicability to the States of a congressionally imposed statute of limitations not expressly including the States, here the will of Congress is apparent and we must follow it. As the legislative history outlined in Part II above shows, Congress agreed with the Executive that § 2409a(f) was necessary for protection of national public interests. In general, a suit by a State against the United States affects the congressionally recognized national public interests to the same degree as does a suit by a private entity. Therefore, the judge-created rule designed to protect the interests of the citizens of one particular State must yield in the face of the evidence that Congress has determined that the national interest requires a contrary rule. We are convinced that Congress had no intention of exempting the States from compliance with § 2409a(f). That section must be applied to the States because they are "necessarily included by the nature of the mischiefs to be remedied." *Weber* v. *Board of Harbor Comm'rs, supra,* at 70. We thus conclude that States must fully adhere to the requirements of § 2409a(f) when suing the United States under the QTA.

---

the power, by the acts relied on by the United States, to divest the city of a vested interest in the property. The Court's decision was in no way based, as the dissent suggests, *post,* at 297, n. 3, on the rule that "estoppel could not be asserted against a sovereign."

## IV

North Dakota finally argues that, even if Congress intended to apply § 2409a(f) to it, and even if valid when applied in suits relating to other kinds of land, the section is unconstitutional under the equal-footing doctrine and the Tenth Amendment insofar as it purports to bar claims to lands constitutionally vested in the State. We are unable to agree.

The State probably is correct in stating that Congress could not, without making provision for payment of compensation, pass a law depriving a State of land vested in it by the Constitution. Such a law would not run afoul of the equal-footing doctrine or the Tenth Amendment, as asserted by North Dakota, but it would constitute a taking of the State's property without just compensation, in violation of the Fifth Amendment.[26] Section 2409a(f), however, does not purport to strip any State, or anyone else for that matter, of any property rights. The statute limits the time in which a quiet title suit against the United States can be filed; but, unlike an adverse possession provision, § 2409a(f) does not purport to effectuate a transfer of title. If a claimant has title to a disputed tract of land, he retains title even if his suit to quiet his title is deemed time-barred under § 2409a(f). A dismissal pursuant to § 2409a(f) does not quiet title to the property in the United States. The title dispute remains unresolved.[27] Nothing prevents the claimant from continuing to

---

[26] The United States can, of course, exercise its eminent domain power to take title to state property. *Oklahoma ex rel. Phillips* v. *Guy F. Atkinson Co.*, 313 U. S. 508, 534 (1941). See also *United States* v. *Carmack*, 329 U. S. 230, 236–242 (1946).

[27] This discussion also answers the argument that our holding conflicts with the Submerged Lands Act of 1953, 43 U. S. C. § 1311, which confirmed in the States title to lands beneath navigable waters within their boundaries. If the river is navigable, the land in question belongs to North Dakota, in accordance with the Constitution and the Submerged Lands Act, regardless of whether North Dakota's suit to quiet its title is time-barred under § 2409a(f).

assert his title, in hope of inducing the United States to file its own quiet title suit, in which the matter would finally be put to rest on the merits.[28]

Thus, we see no constitutional infirmity in §2409a(f). A constitutional claim can become time-barred just as any other claim can. See, *e. g.*, *Board of Regents* v. *Tomanio*, 446 U. S. 478 (1980); *Soriano* v. *United States*, 352 U. S. 270 (1957). Nothing in the Constitution requires otherwise.

## V

Admittedly, North Dakota comes before us with an appealing case. Both lower courts held that the Little Missouri is navigable and that the State obtained title to the disputed land at statehood. The federal defendants have not asked this Court to review the correctness of these substantive holdings other than to submit that these determinations are time-barred by the QTA.[29] We agree with this submission. Whatever the merits of the title dispute may be, the federal defendants are correct: If North Dakota's suit is barred by §2409a(f), the courts below had no jurisdiction to inquire into the merits.

In view of the foregoing, the judgment of the Court of Appeals is reversed. North Dakota's action may proceed, if at

---

[28] Whether, in the absence of a suit by it, the United States would ever acquire good title to the disputed area would, under the present status of the law, be strictly a matter of state law. See H. R. Rep. No. 92–1559, p. 10 (1972) (letter from the Attorney General) ("The State law of real property would of course apply to decide all questions not covered by Federal law"). In many instances, the United States would presumably eventually take the land by adverse possession, but, if so, it would be purely by virtue of state law. Here, North Dakota asserts that the disputed land is public trust land that cannot ever be taken by adverse possession under North Dakota law.

[29] The federal defendants stress that the United States still disputes the lower courts' conclusion that the Little Missouri River is navigable. They state that they did not seek review of that finding in this Court only because they deemed it inappropriate to burden this Court with this purely factual issue. Tr. of Oral Arg. 10. See this Court's Rule 17.

all, only under the QTA. If the State's suit was filed more than 12 years after its action accrued, the suit is barred by § 2409a(f). Since the lower courts made no findings as to the date on which North Dakota's suit accrued, the cases must be remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE O'CONNOR, dissenting.

I agree with the Court that the sole remedy available to North Dakota is an action under the Quiet Title Act. Having concluded that Congress has permitted such suits, though, I would not reject the usual rule that statutes of limitation do not bar a sovereign, a rule that is especially appropriate in the context of these cases. Consequently, I dissent.

Since the Quiet Title Act is the sole relief available to North Dakota, we confront the question whether Congress intended the statute of limitations to bar actions by States. The Court resolves the question by invocation of the principle that waivers of sovereign immunity are to be strictly construed. See *ante*, at 287.[1] The question is not that simple.

Although it is indeed true that the Court construes waivers of sovereign immunity strictly, that principle of statutory construction is no more than an aid in the task of determining congressional intent. In a close case, it may help the Court

---

[1] The Court's reliance on this principle is surprising, since it expressly declines to decide whether, without the Quiet Title Act, sovereign immunity would bar this action. *Ante*, at 285–286. Thus, as far as the Court is concerned, the Quiet Title Act may not in fact be a waiver of sovereign immunity, and these cases then would not present the predicate for the application of the principle that waivers are construed narrowly. Since I believe, for the reasons suggested by the Court, *ante*, at 281–282, that the Quiet Title Act was necessary to permit this action, in my view the principle of strict construction does inform, although it does not control, our inquiry into congressional intent.

choose between two equally plausible constructions. It cannot, however, grant the Court authority to narrow judicially the waiver that Congress intended. *United States* v. *Kubrick*, 444 U. S. 111, 118 (1979); *Indian Towing Co.* v. *United States*, 350 U. S. 61, 69 (1955). The mere observation that a statute waives sovereign immunity, then, cannot resolve questions of construction. The Court still must consider all indicia of congressional intent. Considering all the evidence, I cannot agree with the Court's conclusion that Congress intended to subject the States to a statute of limitations that would prevent their assertion of title to lands held in trust for the public.

The common law has long accepted the principle *"nullum tempus occurrit regi"*—neither laches nor statutes of limitations will bar the sovereign. See, *e. g.*, 10 W. Holdsworth, A History of English Law 355 (1938); D. Gibbons, A Treatise on the Law of Limitation and Prescription 62 (1835). The courts of this country accepted the principle from English law. See, *e. g.*, *Weber* v. *Board of Harbor Comm'rs*, 18 Wall. 57 (1873); *United States* v. *Kirkpatrick*, 9 Wheat. 720, 735 (1824); *Iverson & Robinson* v. *Dubose*, 27 Ala. 418, 422 (1855); *Stoughton* v. *Baker*, 4 Mass. 522, 528 (1803); see generally J. May, Angell on Limitations 29–30 (5th ed. 1869). As this Court observed: "So complete has been its acceptance that the implied immunity of the domestic 'sovereign,' state or national, has been universally deemed to be an exception to local statutes of limitations where the government, state or national, is not expressly included." *Guaranty Trust Co.* v. *United States*, 304 U. S. 126, 133 (1938). In this country, courts adopted the rule, not on the theory that an "impeccable" sovereign could not be guilty of laches, but because of the public policies served by the doctrine. The public interest in preserving public rights and property from injury and loss attributable to the negligence of public officers and agents, through whom the public must act, justified a special rule for the sovereign.

BLOCK *v.* NORTH DAKOTA                                    295

273                    O'CONNOR, J., dissenting

These policies reach their apex in the case of lands held in trust for the public.   The interests of the sovereign, so widespread and varied, hinder it in the exercise of the vigilance in protecting rights that we require of private parties.   Yet the public must not lose its rights because of the constraints on the sovereign.

> "If a contrary rule were sanctioned, it would only be necessary for intruders upon the public lands to maintain their possessions, until the statute of limitations shall run; and then they would become invested with the title against the government, and all persons claiming under it.   In this way the public domain would soon be appropriated by adventurers.   Indeed it would be utterly impracticable, by the use of any power within the reach of the government, to prevent this result.   It is only necessary, therefore, to state the case, in order to show the wisdom and propriety of the rule that the statute never operates against the government." *Lindsey* v. *Lessee of Miller,* 6 Pet. 666, 673 (1832).

Accord, *Guaranty Trust Co.* v. *United States, supra,* at 132; *Weber* v. *Board of Harbor Comm'rs, supra,* at 68, 70; *United States* v. *Knight,* 14 Pet. 301, 314 (1840); J. May, *supra,* at 29.[2]

The lands in controversy here are held in trust for the public by North Dakota, see App. to Pet. for Cert. in No. 81–2337, p. A–6; *United Plainsmen* v. *North Dakota State*

---

[2] The case for protecting the sovereign from the running of time is weaker when the lands are held other than as public trust lands.   When, for instance, a sovereign holds lands in its proprietary capacity, as the United States would hold the title that it asserts to these lands, *ante,* at 277, time may run against the sovereign.   See *Weber* v. *Board of Harbor Comm'rs,* 18 Wall., at 68 ("Where lands are held by the State simply for sale or other disposition, and not as sovereign in trust for the public, there is some reason in requiring the assertion of her rights within a limited period . . .") (dictum).

*Water Conservation Comm'n,* 247 N. W. 2d 457 (N. D. 1976). This case, therefore, implicates the core policies underlying the doctrine, and we should be extremely reluctant to reject the usual rule that time will not bar the sovereign.

The Court, however, dismisses this rule, apparently on the theory that it does not apply in actions between two sovereigns. But the authority that it cites for that proposition is weak at best. *United States* v. *Louisiana,* 127 U. S. 182 (1888), involved a claim for money rather than a dispute to title over public trust lands. More important, the parties never argued for the application of the rule that time does not bar the sovereign. See Brief for Appellant and Brief for Appellee in *United States* v. *Louisiana,* O. T. 1887, No. 1388. The Court's decision in that case therefore cannot serve as authority for rejecting the rule when, as is the situation here, it is raised. Nor does *Minnesota* v. *United States,* 305 U. S. 382 (1939), support the Court. There, a State sought to sue the United States in state court. Construing the waiver of sovereign immunity narrowly, we held that the United States had only waived its immunity as to suits in federal court, and we applied that condition against the State. Since no general rule permits a sovereign to maintain a suit in any forum it chooses, the holding of *Minnesota* reflects nothing more than the usual reluctance to construe waivers of sovereign immunity broadly in the absence of any countervailing considerations.

Thus, our precedents do not reject the principle that time does not bar the sovereign in conflicts between sovereigns. On the contrary, our precedents suggest that a sovereign *can* invoke this principle against another sovereign. In *Rhode Island* v. *Massachusetts,* 15 Pet. 233 (1841), the Court declined to apply the ordinary rule of limitations in a dispute between sovereign States. Chief Justice Taney observed: "[I]t would be impossible with any semblance of justice to adopt such a rule of limitation in the case before us. For here two political communities are concerned, who cannot act with the

273                    O'CONNOR, J., dissenting

same promptness as individuals . . . ." *Id.*, at 273. In particular, when lands held in trust for the public are at stake, the Court has recognized sovereign prerogatives of other governmental units as bars to defenses asserted by the United States. See *New Orleans* v. *United States*, 10 Pet. 662 (1836).[3] Consequently, I disagree with the Court's conclusion that the principle that time will not bar the sovereign has no application in these cases.

Turning to the statute at issue here, the circumstances of its enactment indicate that Congress did not intend to bar actions by States. As general background, we know that Congress was aware of the rule that, to affect the government, an enactment imposing a burden or a limitation must expressly include the sovereign. See, *e. g.*, *Wilson* v. *Omaha Indian Tribe*, 442 U. S. 653, 667 (1979). The particular incident that spurred Congress to pass the Quiet Title Act was a dispute between private landowners and the Federal Government. See Hearings on S. 216 et al. before the Subcommittee on Public Lands of the Senate Committee on Interior and Insular Affairs, 92d Cong., 1st Sess., 83–85 (1971) (affidavit of A. L. Robinson). The statements in the hearings reflect a focus on disputes between private citizens and the Federal Government. See, *e. g.*, *id.*, at 20 (statement of Shiro

---

[3] In *New Orleans* v. *United States*, the United States argued that the city of New Orleans was estopped to assert title to certain lands held for the public. At the time, estoppel could not be asserted against a sovereign, see, *e. g.*, *Filor* v. *United States*, 9 Wall. 45, 49 (1870), and the Court declined to estop the city, largely on the ground that the lands were held in trust for the public and, since the sovereign could not by act convey them, the sovereign's acts could not estop it from asserting that they were not conveyed. Although the protection against estoppel has since largely dissipated, see generally Note, Equitable Estoppel: Does Governmental Immunity Mean Never Having to Say You're Sorry? 56 St. John's L. Rev. 114 (1981); K. Davis, Administrative Law of the Seventies § 17.01 (1976), the application of that protection in *New Orleans* contradicts the view of the majority that in controversies between the United States and another sovereign, only the United States can rely on sovereign attributes.

Kashiwa) (referring to claims of "private citizens"); *id.*, at 55, 58 (statement of T. E. McKnight) (observing that "private landowners" had no right to sue the Government). See also S. Rep. No. 92–575, pp. 1, 2 (1971) (recognizing inequity of denying action to "private citizen" and explaining that bill would enable "citizen" to have his day in court). Finally, the House Report explained the limitations provision in the Quiet Title Act as designed to give *"persons"* a certain amount of time to sue. H. R. Rep. No. 92–1559, p. 5 (1972).

Indeed, this Court has already been called upon to conform the provisions of the Quiet Title Act—enacted by Congress with private citizens in mind—to the special requirements of litigation involving States. In *California* v. *Arizona,* 440 U. S. 59 (1979), California sought to sue Arizona and the United States, in a quiet title action in which both defendants were indispensable parties. Under the Constitution, this Court had original jurisdiction over the claim against Arizona, U. S. Const., Art. III, § 2, and Congress had conferred exclusive jurisdiction on this Court. 28 U. S. C. § 1251(a)(1). The claim against the United States, however, could only be maintained under the Quiet Title Act, which vested exclusive jurisdiction in the district courts. 28 U. S. C. § 1346(f). In spite of the general language placing *all* quiet title actions against the United States in the district courts, we concluded that Congress did not intend to divest this Court of its jurisdiction. Thus, while Congress clearly intended that States be able to maintain quiet title actions, the procedural provisions drafted with the private citizen in mind need not be applied with slavish literalness to States.[4]

Finally, we cannot ignore the special nature of the lands at issue in this case. The beds of navigable waters pass to the States when they achieve statehood under the constitutional

---

[4] Cf. *Wilson* v. *Omaha Indian Tribe,* 442 U. S. 653, 667 (1979) (rule that statute must expressly include sovereign is particularly applicable "where the statute imposes a burden or limitation, as distinguished from conferring a benefit or advantage").

273                    O'CONNOR, J., dissenting

equal footing doctrine, as an incident of sovereignty. *Montana* v. *United States*, 450 U. S. 544, 551 (1981); *Pollard's Lessee* v. *Hagan*, 3 How. 212 (1845). And the lands are of critical importance to North Dakota, which holds them in its sovereign capacity in trust for its citizens.[5] Congress has recognized the special importance of these lands in the Submerged Lands Act, 67 Stat. 30, 43 U. S. C. § 1301 *et seq.*[6] Until today, the Court too has shown special sensitivity to the importance of these lands, recognizing the strongest presumption that Congress will not act to convey the lands rather than to preserve them for the State. *Montana* v. *United States, supra,* at 552. Given that solicitude for the State's ownership of these lands, it becomes extremely difficult to believe that Congress intended to deny States dominion over these lands by silently extinguishing their right to quiet title. I would affirm the judgment below.

---

[5] Cf. *United States* v. *Oregon*, 295 U. S. 1, 14 (1935) ("Dominion over navigable waters and property in the soil under them are so identified with the sovereign power of government that a presumption against their separation from sovereignty must be indulged, in construing either grants by the sovereign of the lands to be held in private ownership or transfer of sovereignty itself. . . . For that reason, upon the admission of a State to the Union, the title of the United States to lands underlying navigable waters within the States passes to it, as incident to the transfer to the State of local sovereignty, and is subject only to the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce").

[6] In § 3(a) of the Act, 60 Stat. 30, 43 U. S. C. § 1311(a), Congress provided:

"It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States . . . ."

# EXHIBIT 2

# EXHIBIT 3

 **PROPERTIES IN TX, LLC**

A TEXAS LIMITED LIABILITY COMPANY

6046 FM 2920 RD STE 160, Spring, TX 77379-2542
e-Mail: AR@PCFProperties.net

Phones: 832-413-1723 or 281-6688-PCF
Fax: 636-212-9452

**CHANEE T COLEMAN and/or ALL OCCUPANTS**
**15538 Kiplands Bend Dr**
**Houston, TX 77014-1535**
MAILED VIA REGULAR AND CERTIFIED MAIL 9589 0710 5270 0037 7310 59

**ACCEPTED**

*05/09/2026*

## FORMAL NOTICE TO VACATE

Saturday, May 9, 2026

Dear **Ms. Coleman (and/or All Occupants):**

Your residence at 15538 Kiplands Bend Dr was foreclosed upon at the trustee sale of May 5th, 2025 by the substitute trustee appointed by your lender. Our company, P.C.F. Properties In TX, LLC is the new owner of the property. You are now a tenant at sufferance pursuant to Section 22 of the Deed of Trust that led to the foreclosure.

Given this event, since May 5th, all the property holding costs, financial (cost of funds), property taxes (since the beginning of the year) and HOA Assessments, are now our responsibility.

**We are hereby giving you this written notice, per Chapter § 24.005 of the Texas Property code to vacate the premises and deliver them back to us in their original condition.**

This letter constitutes notice that you are required to VACATE THE PROPERTY and to remove all of your personal belongings **within three (3) days of the date of this letter.** If you fail to comply with this demand, and do not vacate the Property by the 4th day from the date of this letter, we may, at our option, file suit against you for actual damages, attorney fees and costs of court. *No further notice shall be given.*

Be advised that failure to take action, will result in a forcible detainer suit against you.

Cordially,

_____, DIRECTOR

P.C.F. Properties In TX, LLC
By Antony Halaris, Director of its Managing Member

**PROPERTIES IN TX, LLC**

6046 FM 2920 Rd Ste 160,
Spring, TX 77379-2542

RETURN SERVICE REQUESTED

ACCEPTED
05/09/2026

IMPORTANT
DOCUMENT

CHANEE T COLEMAN
15538 KIPLANDS BEND DR
HOUSTON, TX 77014-1535